OWEN v. POTTER.[1]

1. GUARANTY—TRANSFER BY DELIVERY.

A general guaranty of payment according to the tenor of the instrument, indorsed upon a bond payable to a specified person or bearer. if not strictly negotiable, is at least transferable by delivery, subject to equities.

2. SAME—ENFORCEMENT OF SECURITY—RELEASE OF GUARANTOR.

A guarantor of the payment of bonds secured by a trust mortgage is not released because the property, instead of being subjected to mortgage foreclosure, is sold in bankruptcy proceedings on the petition of the obligees.

3. JURISDICTION—STATE AND FEDERAL COURTS—FORECLOSURE.

The institution of proceedings in a State court to foreclose a lien upon property in the custody of the Federal court upon a petition in bankruptcy, without first obtaining the permission of the latter court, is irregular and unauthorized.

4. MORTGAGES—FORECLOSURE—PARTIES—GUARANTORS.

It seems that a guarantor of payment of bonds secured by a mortgage is not a necessary party to a suit to foreclose the mortgage.

5. BANKRUPTCY—ASSIGNEE'S SALE—SECURED CREDITORS.

Bondholders who purchase property securing their bonds at a sale by the assignee in bankruptcy of the obligor, and after-

---

[1] Rehearing denied July 18, 1898.

wards resell the property at a profit, are not bound to apply such profit upon the bonds.

6. EXECUTORS AND ADMINISTRATORS—ACCOUNTING—PURCHASE OF CLAIMS AT DISCOUNT.

An executor cannot be required to account to the estate for the amount in which the sum awarded. to a claimant against it exceeds the sum for which the claim was purchased by the latter after the death of the deceased, even though the assignor of the claim, being a corporation in which the executor was a stockholder, would have sold it to the estate at the same discount allowed to the claimant.

7. SAME—PERSONAL INTEREST.

Nor is the executor culpable in sharing as a stockholder in the proceeds of the sale by the corporation.

8. ESTATES OF DECEDENTS — ABSOLUTE AND CONTINGENT CLAIMS— INDORSED NOTES.

Notes past due and unpaid may be allowed as absolute claims in favor of the holders against the estate of a deceased indorser; and evidence that the executor, from time to time, paid dividends upon such claims, which were allowed to him in his various accounts, sufficiently shows that the notes were allowed absolutely, and not as contingent claims.

9. SAME — PROMISSORY NOTE — RESPONSIBILITY OF MAKER — EVIDENCE.

The contention that an executor was negligent with respect to certain notes, upon the deceased's indorsement of which the estate was held liable, for the reason that they were collectible from the maker, is disproved where it appears that the notes were left unpaid by the maker for several years, and were then disposed of by the holders at a heavy discount.

10. SAME — PARTNERSHIP TO PURCHASE CLAIMS AT DISCOUNT — FRAUD.

The action of testator's widow and her two brothers in forming a partnership to buy claims against the estate, which was generally believed to be insolvent, at a discount, and to apply them at their full value to the purchase of property belonging to the estate (an order of the probate court permitting them to be so applied to the amount of 40 per cent. of the purchase price), thereby acquiring the bulk of the property of the estate at a large profit to themselves, was not fraudulent as to legatees and creditors whose claims remained unsatisfied.

11. SAME—SPECULATION IN CLAIMS.
    Any one, except the executor, may lawfully buy in the debts of the estate at a discount, and collect their face value, or buy property at executor's sale for what it will bring, or purchase the claims of legatees.

12. SAME—LIABILITY OF EXECUTOR—EQUITY.
    An executor will not be held liable to the heirs or legatees in a court of equity merely because all of his acts in the management and disposition of the estate were not technically legal, where they met with the approval of the probate court at the time, and were apparently for the best interests of the estate.

Appeal from Wayne; Carpenter, J. Submitted May 18, 1897. Decided January 25, 1898.

Bill by Orville W. Owen and others against Orrin W. Potter and others for an accounting as to the assets of the estate of Eber B. Ward, deceased. From a decree dismissing the bill, complainants and defendant Tubal C. Owen appeal. Affirmed.

*Moore & Moore 'J. B. Tuttle,* of counsel), for complainants.

*Timothy E. Tarsney,* for defendant Tubal C. Owen.

*Wells, Angell, Boynton & McMillan (John P. Wilson,* of counsel), for defendant Orrin W. Potter.

*Edward A. Gott (William W. Gurley* and *Horace G. Stone,* of counsel), for defendants Catherine L. Cameron, John B. Lyon, and Thomas R. Lyon.

HOOKER, J. The bill in this cause is filed upon the theory that, through a collusive arrangement between them, Orrin W. Potter, the executor of the estate of Eber B. Ward, deceased, and the other defendants, have unlawfully acquired large sums at the expense of the estate. It is alleged that this has been accomplished by the allowance and payment of unjust claims, and by purchasing

assets at prices below their fair value. Ward died in 1875, leaving a large estate, seriously incumbered, at a time when gold was at a premium, and values were as greatly depressed as they have been at any time within 50 years. He owned stock in various concerns, notably the North Chicago Rolling-Mill Company, the Pneumatic Steel Company, the Milwaukee Iron Company, the Wisconsin Iron Company, the Wyandotte Rolling-Mill Company, the New England Mining Company, and the Flint & Pere Marquette Railroad Company. He also owned Burlington & Southwestern Railway bonds, lands in Chicago, Lucas county, Ohio, and other places (including Michigan), and a valuable tract of pine land known as "Ludington." He also owned vessel property and other interests, which need not be specifically mentioned. Among his obligations were a personal guaranty upon bonds of the Milwaukee Iron Company to the amount of $400,000, a similar guaranty upon Flint & Pere Marquette Railroad notes of about $203,000, and some personal bonds called "Ward Loan Bonds," secured by mortgage upon real estate. It is claimed that his obligations aggregated a million and a half dollars, and that his assets amounted to six million dollars; though the complainants maintain that his indebtedness was much less, and defendants insist that six million is a most extravagant valuation of his property.

The relation of the several parties to the testator and each other is as follows: By his first wife, Ward's children were Charles H. Ward, who assigned his claim to Mrs. Cameron; Milton D. Ward, who died about 1880, without issue; Lizzie and Henry,—both insane,—the latter having died without issue; and Mary, who married William B. Ely, and subsequently died, leaving a son, William B. Ely, Jr. By his second wife, Catherine L. (who is now Catherine L. Cameron), Ward had two children, viz., a son, Eber B. Ward, Jr., and a daughter, who became Princess du Chimay. "Aunt Emily Ward" was a sister of the testator. She died before this suit was

commenced. Abbey Owen and Sally Brindle were also Ward's sisters. Their children, with the exception of Tubal C. Owen, 2d, and Ellen Potter, wife of the executor, are complainants. Tubal C. Owen, 2d, is a nominal defendant, though a complainant in interest. William B. Ely, Jr., is also a complainant. The other descendants of Ward's first wife appear to have adjusted their interests through litigation or sale. The defendants are Orrin W. Potter, the executor, Ellen O. Potter, his wife (a daughter of Abbey Owen), Catherine L. Cameron (Ward's widow), her brother, Thomas R. Lyon, her half-brother, John B. Lyon, and the Illinois Steel Company, an Illinois corporation, successor to the North Chicago Rolling-Mill Company.

Eber B. Ward left a will and two codicils, the will proper and the first codicil being admitted to probate by the circuit court, the case having been appealed from the probate court, where the will and both codicils were sustained. The following summary of the will and codicils, taken from the complainants' brief, sufficiently shows the interest of the parties:

"By the original will, the widow and her two children received about $1,000,000 of real and personal property, specifically devised and bequeathed. The executors were directed to pay the debts, and some comparatively small legacies, to sell all the property, and reduce the remainder to interest-bearing securities, and to turn over these securities to themselves, Potter, Wyman, Mumford, and Owen, as trustees, who were to divide the income into six parts, and distribute it equally to Captain Ward's five children by his first wife, and his sister Aunt Emily Ward. At the death of Aunt Emily, one-sixth was to be paid to the surviving children of his sisters Abbey Owen and Sally Brindle, and, at the death of the last of Ward's five children by the first wife, the whole body of the trust was to go to these children of said sisters; provided, however, if either of the said five children left children, each family of grandchildren should inherit one-sixth.

"*First codicil:* This made certain provisions for guardianship of the children named, and declared the devises to his wife to be in lieu of dower.

" *Second codicil :* The second codicil provided : 'After mature deliberation, I do hereby direct that my executors named in my said last will, whether acting as executors or trustees, as therein provided for, shall pay to each of my children Henry S., Milton D., Charles H., Elizabeth V., and Mary E. Ward a sum not to exceed $200 per month, for their support; the same to be paid out of the income from my estate. * * * This limitation is made, as in my judgment it will tend to their advantage.' "

Our understanding is that the appeal to the circuit court was taken on behalf of two of the children by Ward's first wife, who attacked the competency of the testator. The question was tried twice by jury, and finally compromised upon the second trial by the payment of about $100,000 to the contestants, who withdrew opposition, and the will and first codicil were then proved. *It is claimed that this arrangement was collusive on the part of the widow and executor, and had the effect of permitting the division of the entire income as provided by the will, instead of adding any surplus to the body of the trust, as might have been done under the second codicil, had the estate produced an income of more than enough to pay the sum of $200 per month to each of the first set of children.* In this connection it may be well to add that, under the will and two codicils, the estate must have been disposed of in the following order: *First,* payment of debts; *second,* Ludington, and some other property, to the widow and her children; *third,* the dwelling and other property to the children by the first wife; *fourth,* 1,130 shares of stock, which was specifically bequeathed; *fifth,* the remainder was to constitute a trust fund, and it was from this fund only that possible benefits to the complainants were to be expected. It is apparent that, if there was not sufficient property to pay the debts, there could be no trust fund, and that the second codicil would not become operative, and, under the entire instrument, the complainants would have no interest in the estate. If,

however, there should have peen a trust fund, these complainants are interested, and under the second codicil their interest might be greater than under the terms of the will as first executed. The evidences of fraud mainly cluster about the items mentioned, and it is urged that, taken together, the various transactions justify the inference of a collusive arrangement between the executor, Potter, the widow, and her brothers.

Among the points made by counsel for the complainants is the allegation that the executor was a party to the fraudulent disposition of the estate's interest in four concerns known as the Wisconsin Iron Company, the Milwaukee Iron Company, the Pneumatic Steel Company, and the North Chicago Rolling-Mill Company. It is said that this was done by aiding, if not causing, the latter to absorb the three former, and then selling the latter for an inadequate price. The concern known as the Wisconsin Iron Company consisted of the North Chicago Rolling-Mill Company, the Milwaukee Iron Company, and Ward. Counsel say that they owned the property in partnership, Ward owning one-fifth, and each of the others two-fifths. It consisted of iron mines, furnaces, about 1,000 acres of land within 40 miles of Milwaukee, and a body of land near the entrance of the harbor at Milwaukee. Counsel disagree as to its value, one side maintaining that the water front of the last-mentioned parcel made it of "enormous value;" the other insisting that it is a swamp, of little value, and that the plant was out of date, and not adapted to the methods of the day. This property was all bought of the Swedes Iron Company for about $985,-000, subject to a mortgage of $200,000. It would, therefore, seem that at the time of its purchase, in 1869, it was considered worth about $1,000,000. We may reasonably conclude that the effect of the panic of 1873 caused a great depreciation in its value. The purchasers assumed proportionate shares of the $200,000 obligation, and the North Chicago Company paid its two-fifths, while Ward and the Milwaukee Company did not pay their shares.

We may here profitably drop the subject of the Wisconsin Iron Company for the time being, to consider the Milwaukee Iron Company, one of the partners. The Milwaukee Iron Company was a competitor in business of the North Chicago Rolling-Mill Company, and, as already seen, Ward had stock in both. There were two mortgages upon the Milwaukee Company property: (1) A mortgage dated April 1, 1872, for $400,000, to secure its first-mortgage bonds, which covered the original plant, consisting of 27 acres of land, and buildings thereon. (2) A mortgage dated November 1, 1875, covering the property mentioned, and other property, including its two-fifths interest in the Wisconsin Iron Company real property. According to complainants' brief, the secured obligations of this company outstanding amounted to $950,000, and its floating debt to $450,000, aggregating $1,400,000, and the value of the property was $1,959,000. On October 16, 1876, a petition in bankruptcy was filed against said company, and in due season it was adjudicated a bankrupt. After this adjudication, petitions were filed in the court having jurisdiction of the bankruptcy proceedings, by and on behalf of the bondholders, praying for a sale, and application of the proceeds of the mortgaged property to the payment of the bonds; and under direction of the court the assignee in bankruptcy made such sale. The effect of these proceedings was to render valueless any stock that the Ward estate had in the Milwaukee Iron Company. It also brought into prominence the fact that there was a guaranty by Ward upon the $400,000 of bonds, and that the estate might be asked to pay a deficiency arising from the sale.

Again, both the Ward estate and the North Chicago Rolling-Mill Company were interested in the *Wisconsin Iron Company mortgage debt*, two-fifths of which the Milwaukee Iron Company had promised to pay, and which they would have to provide for, or submit to a foreclosure of the $200,000 mortgage upon the entire property; and, if the defendants' brief correctly states the arrange-

ment, the Ward estate, as well as the North Chicago Rolling-Mill Company, might be called on to pay a possible deficiency.

After the confirmation of the sale, the property covered by the first mortgage was conveyed to Keenan, Ferguson, and Nash, trustees, selected by the bondholders, by deed dated February 18, 1878, and they executed a declaration of trust in favor of the first-mortgage bondholders. The proceeds of the sale were ratably applied upon the bonds, and indorsed by the clerk of the court, with whom they were filed. The balance of the debt upon each bond was allowed by the register in bankruptcy as an unsecured claim in favor of the bondholder, and that fact, and the amount, were indorsed upon the bonds by the register, as was also the final dividend of $11\frac{1}{2}$ per cent. A similar course was pursued as to the second mortgage and bonds; the property being deeded by the assignee to Burt, Tweedy, and Keenan, trustees. We find, therefore, that the property covered by the second mortgage came to the possession of Burt, Tweedy, and Keenan. It will be remembered that this deed included a two-fifths interest in the land and buildings of the Wisconsin Iron Company, subject, however, to the mortgage of $200,000. Both the Ward estate and the North Chicago Rolling-Mill Company were interested in seeing their interests relieved from paying any portion of this liability beyond their proportionate and respective shares, and it is plain that it was necessary for one or both of them to see that the mortgage was paid, or to bid in the property at mortgage sale, if anything was to be realized out of the investment.

The Wisconsin Iron Company had some personal property, which, apparently, was not covered by the mortgage given by the Milwaukee Iron Company. The latter company owned a two-fifths interest in this property, which, after the foreclosure sale, would be all of its interest remaining. On the other hand, the Milwaukee Iron Company owed the Wisconsin Iron Company $34,242.46. An arrangement was made by direction of the court in bank-

ruptcy and the consent of the probate court whereby the assignee released this two-fifths interest in the personal property in consideration of a release by the Wisconsin Iron Company of its claim against the bankrupt. The one-fifth interest of the Ward estate in this personal property was increased thereby to one-third.

As already seen, the North Chicago Rolling-Mill Company paid its two-fifths of the Swedes Iron Company mortgage, but the Milwaukee Iron Company and the Ward estate did not pay their shares. Thereupon, on leave granted by the federal court, a bill was filed to foreclose this mortgage, to which the executor and all of these complainants were made parties. It then became necessary for the North Chicago Rolling-Mill Company and the executor to determine what they should do to protect their respective interests, which, manifestly, could be done only by bidding in the property for the amount due upon the mortgage. It is evident that the Ward estate was in no condition to do this, while the North Chicago Rolling-Mill Company could do so. Moreover, the Ward estate could make no use of the property, and the North Chicago Rolling-Mill Company could. An arrangement was made by which the estate agreed to sell to the North Chicago Rolling-Mill Company its interest in the Wisconsin property upon an undertaking by the North Chicago Company to indemnify the estate against liability for a deficiency. The estate's interest was duly advertised, and bid in by Burt, the deed made by the executor running to Burt, Keenan, and Tweedy, trustees for the Milwaukee Iron Company bondholders, who had bought a two-fifths interest at the foreclosure sale of that interest, and the North Chicago Rolling-Mill Company, the owner of the other two-fifths. Mrs. Cameron quitclaimed her interest for one dollar. The North Chicago Rolling-Mill Company executed a covenant, reciting this transfer, and agreeing to assume and pay the Ward share of the mortgage,—*i. e.*, $40,000,—and save the estate harmless therefrom. It is obvious that these trustees were interested in

protecting this property from sacrifice, having bought a two-fifths interest, subject to the mortgage, as already stated. The property went to sale under the decree, and was bid in for the amount remaining due upon the mortgage by these parties in equal proportions. This occurred on July 12, 1879, and the sheriff's deeds put one-half of the Wisconsin Iron Company's property in the hands of the North Chicago Rolling-Mill Company, and the other half in Burt, Keenan, and Tweedy, trustees of the second bondholders of the Milwaukee Iron Company.

Leaving this subject here for the present, we will follow the remainder of the Milwaukee Iron Company property, which, it will be remembered, was purchased by the trustees of the bondholders of that company, Keenan, Ferguson, and Nash for the first-mortgage bondholders, and Burt, Keenan, and Tweedy for the second. Each set of trustees had practically foreclosed its mortgage, and obtained the mortgaged property for the bondholders, but the latter had so far realized nothing in the way of payment therefrom. It remained for these trustees to convert the property into money for their *cestuis que trustent*. Most of the first-mortgage bonds were held in Milwaukee, the Northwestern Mutual Insurance Company owning $230,000 of them. At some time in the course of these proceedings, the North Chicago Rolling-Mill Company conceived the idea of purchasing the Milwaukee Iron Company property, and on February 20th, at a directors' meeting, a purchase from the Northwestern Mutual Insurance Company was authorized, and a contract was made whereby the North Chicago Rolling-Mill Company became the owner of its interest in the $230,000 first-mortgage bonds, and $119,000 of second-mortgage bonds, and all the interest of the Northwestern Mutual Insurance Company in the property, for the price of about $300,000. On March 18, 1878, the North Chicago Rolling-Mill Company leased all the property owned by the trustees of the first mortgage, and much of that purchased by the trustees of the second mortgage, excluding, how-

ever, the Wisconsin Iron Company property. It also contracted for the purchase of the property leased for sums agreed upon. The consideration for the purchase of the first was $406,720, which appears to have been the amount due upon the first-mortgage bonds. The purchase price of the second was $259,500, which was 50 per cent. of the second-mortgage bonds. Rent, equal to 6 per cent. upon the amount, was reserved for the period of 10 years, at the expiration of which time the purchase was to be made. The holders of the first-mortgage bonds received black certificates, the holders of the second-mortgage bonds received red certificates for the first 50 per cent., represented by the $259,500, and one green certificate for each bond, which entitled the owner to 1-519 of the proceeds of certain other property held by the trustees. Subsequently the red and green certificates were bought or paid by the North Chicago Rolling-Mill Company, and presumably the North Chicago Rolling-Mill Company paid the consideration for its purchase to the trustees when it became due, taking title from them, and the trustees disbursed the money to those entitled to it. We have now traced the title of the property of the Milwaukee Iron Company into the North Chicago Rolling-Mill Company.

Let us next trace the bonds. February 21, 1878, the North Chicago Rolling-Mill Company bought from the Northwestern Mutual Insurance Company its interest in the bonds to the amount of $230,000, as shown, which, with accrued interest, amounted to $265,245.36. A week before this, all of the bonds save two were delivered to the trustees (selected by the bondholders, as shown), the holders taking receipts for them. On February 23d they were delivered to the clerk of the United States district court, and remained with him until called for by Burt. On March 16, 1878, the bondholders authorized the trustees to dispose of their claims by an instrument containing the following clause:

"And we also authorize and request you, so far as we are respectively authorized to do so, to lease the whole of the said property, including any that may be purchased by you, and which may not be sold by you, as above provided, to the North Chicago Rolling-Mill Company, for such time and on such terms as you may deem best, and to contract in the lease for a sale of the property to the lessee at any time within the term of the lease, or of such renewal thereof as may be provided for by the terms of the lease, at such price and on such terms as you may think best, and as a part of the consideration of said lease and contract, in your discretion, to transfer to said lessee any balance of funds which may remain in your hands, as well as the dividends to be collected from the general assets of said Milwaukee Iron Company, and other claim or claims which may exist in favor of the holders of the said bonds against any person or persons, arising upon or in any manner connected with said bonds, or, in your discretion, to compromise or assign any such claim or claims to any person or persons, and transfer to said lessee the proceeds or avails of such compromise or sale, as a part of the consideration of said lease and contract."

It is claimed that, acting under this, the trustees sold the bonds to Lyon, after obtaining the original bonds from the clerk of the district court, and leaving his receipt as trustee. The receipts given for the bonds to the bondholders by the trustees appear to have come back to the hands of the trustees. All of this is of interest because Lyon, after obtaining these bonds, filed a claim against the Ward estate for the deficiency remaining after the application of the amount bid for the property at bankruptcy sale, and the $11\frac{1}{2}$ per cent. dividend. This brings us to the Ward guaranty, upon which Lyon was allowed the amount of said deficiency. Upon each of the bonds was the following guaranty:

"For value received, I hereby guarantee the payment of the above bond, and coupons referred to therein, according to their tenor.

"April 1, 1872.          E. B. WARD."

The executor did not contest this claim. It is said that he should have done so. Counsel attack the validity of the claim upon several grounds, contending that:

1. The guaranty could not pass by delivery, though the bonds could; and Ferguson, the payee never assigned the guaranty.

2. David Ferguson, as trustee, was the only person authorized to foreclose the mortgage.

3. The bondholders did not foreclose the mortgage as provided by law, and therefore the guarantor was discharged.

4. The bondholders were paid in full out of the mortgaged property, and this discharged the guarantor.

5. The parties who presented the bonds against the estate had no title to them, and were not entitled to an allowance of the claim.

This guaranty was upon a bond which provided that:

"The Milwaukee Iron Company, for a valuable consideration, acknowledges itself to be indebted to David Ferguson, or bearer, in the sum of $1,000, which sum it agrees to pay, on the presentation of this bond, to the holder thereof. * * * And it is further agreed that this obligation, and all rights by virtue thereof, may be transferred by delivery in the same manner as if it was a promissory note payable to bearer."

Whatever else may be said about this guaranty, it gave an immediate right of action by Ferguson against Ward upon matured and unpaid bonds. They were, however, secured by mortgage upon Milwaukee Iron Company's property; but we are not advised that anybody claims that this lessened the guarantor's liability. It did, perhaps, increase his rights. It is not necessary that this guaranty be negotiable. It is enough to answer the first point if it be transferable, and of that there can be no doubt. It was an undertaking as surety, and at common law was assignable, though an action at law would have had to be brought in the name of the payee. In *Waldron* v. *Harring*, 28 Mich. 494, this court, in speaking of a guaranty upon a note payable to bearer, said:

" No one can suppose, when a guaranty is given in the unrestricted form used here, that it was not intended to pass with the note, which was payable to bearer. The rules which prevent its negotiability, in the strict sense of

that term, have never been supposed to interfere with its assignment. All personal claims of this sort are assignable, but at common law they were taken subject to equities," etc.

The purchaser of· the bond acquired an equitable interest, if no more, by the purchase.

The next proposition is that the bondholders foreclosed the mortgage, and that this was done without notice to Ward's representatives, and before all of the bonds were due, and that the estate was thereby released, as, by the terms of the mortgage, only the trustee could foreclose it. It goes without saying that the bondholders did not institute foreclosure proceedings based on the mortgage, although, by its terms, it was subject to foreclosure when the least default in payment was made. What they did was to file petitions in bankruptcy proceedings (which necessarily involved a showing of insolvency), alleging the inadequacy of their security, and asking that the property be applied on their debts. Upon the original petition in bankruptcy the concern was adjudicated a bankrupt, under the federal law, and all of its property was disposed of by the court having its custody, with which another court could not interfere. Of necessity, the mortgaged property was sold separately, as the interest of the Wards and the bondholders required that the amount to be applied upon these bonds might be known. As the mortgage was not foreclosed at all, we need not inquire what the provisions of the law of Wisconsin were as to the foreclosure of mortgages.

It is contended that the bondholders were paid in full out of the property. This is not admitted, though it is true that the trustees, who bid in the property, were able to and did realize for the bondholders much more than they paid for it. It was their duty to· sell it to the best advantage, but we understand that the profit belonged to the bondholders, who then were the equitable owners, and that neither the mortgagor nor the Ward estate was entitled to it; the credit to which they were entitled being

limited to the amount received at the assignee's sale. It follows that the estate is not concerned in the price that Lyon paid for these bonds. The owners were at liberty to sell them for any price, or to give them away, if they saw fit. The important question is whether the fact that the bondholders were secured by mortgage precluded them from instituting proceedings in the bankruptcy court to enforce their rights, and to reach assets not included in their mortgage, and, if they did so, whether the guarantor was thereby discharged. It is obvious that the mortgaged property might lawfully be subjected to the payment of these bonds upon a foreclosure by the trustee, and, although guarantors of payment might be proper parties, we have been cited to no case which holds that they are necessary ones. See *Johnson* v. *Shepard*, 35 Mich. 122.

If the guarantor would be subrogated to the rights of the creditor or purchaser, he should pay the debt or offer to redeem. It is shown that the executor had notice of the pendency of these proceedings, that he and others interested in the estate were advised of the existence of this guaranty, and eminent counsel investigated the matter for them, while there was opportunity to pay. But the estate was in no condition to avail itself of its rights, and, not only that, but there is no evidence that any one connected with the transaction advised it. We are satisfied that the creditors had the right to proceed in the court of bankruptcy, instead of waiting for a foreclosure, and we do not see how the guarantor was injured thereby. As already intimated, the federal bankruptcy law (14 U. S. Stat. at Large, 517) placed the custody of this property in the district court. Officers of the State court could not lawfully have interfered with it; and an attempt to subject it to sequestration through foreclosure, in another court, without permission, would have subjected the party to contempt proceedings. In Bump, Bankr. (10th Ed.) p. 171, it is said:

" The jurisdiction of the district court, sitting as a court of bankruptcy, extends to the collection of all the assets of the bankrupt, the ascertainment and liquidation of the liens and other specific claims thereon, and the adjustment of the various priorities and conflicting interests of all parties ( section 4972 ). The commencement of proceedings in bankruptcy gives to the district court jurisdiction over the bankrupt, his estate, and all parties and questions connected therewith. The property and estate of the bankrupt, so far as any interference therewith is concerned, is thereby brought *eo instante* into the court of bankruptcy, and placed in its custody and under its protection as fully as if actually brought into the visible presence of the court. Its jurisdiction is superior and exclusive in all matters arising under the statute. The officer appointed to manage it is accountable to the court appointing him, and to that court alone. No court of an independent State jurisdiction can withdraw the property surrendered, or determine in any degree the manner of its disposition. Claims against the estate, so long as it remains in the possession of the court, can generally be only enforced by proceedings properly instituted therein, or under its authority. The levy of an execution, the institution of an action to foreclose a mortgage, the filing of a libel *in rem*, the issuing of a distraint warrant, the recording of claims for mechanics' liens under a law which only makes the claim a lien from the time of such filing, after the filing of the petition in bankruptcy, are all proceedings that are irregular and unauthorized."

And again the author says:

" There is no distinction in the bankrupt law between different kinds of liens. Its provisions apply equally to all liens, of whatever kind, character, or description. The first point to be ascertained is whether there is a valid lien according to the laws of the State where the property is situated. If there is no valid lien under those laws, there can be no claim upon the property under the bankrupt law. If there is a valid lien under those laws, it follows the property into the court of bankruptcy, and will be there recognized, protected, and enforced. Liens are of various descriptions, and may arise in various ways. The definition that seems to be warranted upon principle, as well as authority, is that, whenever the law gives a creditor the right to have a debt satisfied from the proceeds of

property, or before the property can be otherwise disposed of, it gives a lien on such property to secure the payment of this debt. Whenever such a lien exists, the assignee must determine what course he will pursue in regard to it."

We understand this to be the well-settled rule. Usually a guarantor is discharged by a release of security; but here was none. The mortgage and guaranty were made in contemplation of the bankruptcy law, which was in force at the time. If it gave an additional remedy to that by foreclosure, the guarantor here has no right to complain. Counsel cite many cases in support of the rule that a surety is discharged, as to the whole or a part of his liability, by an act of the creditor which releases the security held. The gist of the contention here is that these creditors put it out of their power to foreclose by proceeding in bankruptcy, and allowing title to the mortgaged property to be acquired by others or themselves without notice to the Wards; and, again, that by beginning these proceedings, which had the effect to foreclose before the entire debt was due, they prevented the guarantor from paying the debt and taking the security when it all became due. We think there is no force in this claim. The law did this, if it was done. Whether the property in the hands of the creditors, by purchase at the judicial sale, was subject to redemption by the guarantor, for a reasonable time, on payment of the amount guaranteed or paid, we need not inquire, as no effort has ever been made to assert such right. As in other instances, returning prosperity and municipal growth probably made this property, especially that adjacent to Milwaukee, valuable; but there is nothing to indicate that the estate could profitably have redeemed it at the time or soon after it was sold, had it possessed the funds to do so, which it did not.

The North Chicago Rolling-Mill Company bought the land and the unsatisfied claim. Apparently, it might have collected the deficiency from the estate if the estate was solvent. It chose to sell for $64,000, and it does not

necessarily follow that Potter profited thereby. If he knew of the contemplated sale, and that the estate could pay, it would have been good business management to buy it for the estate; but he was under no legal obligation, and it does not appear that he could have done so.

It has been contended that the executor wrongfully permitted Lyon to profit from the guaranty of the Milwaukee Iron Company bonds. It is claimed that a transaction somewhat similar is found in connection with the Flint & Pere Marquette Railroad Company, and that Lyon and Mrs. Cameron reaped the benefit. The bill charged that in 1874 the Flint & Pere Marquette Railroad Company made its notes, payable to Samuel Farwell and Ward, for $183,500, and to said persons and H. C. Potter for $20,000, which were duly indorsed and negotiated. This was accommodation paper. During the administration of the estate, Lyon and Cameron acquired these notes, and defendant Potter paid 60 per cent. upon them, and thereafter the defendants caused a petition to be presented to the probate court, asking that Potter be permitted to join with Lyon and Cameron in compromising with the railroad company, which, being authorized, Potter received certain mortgage bonds of the railroad company to the amount of $282,000 in settlement of the claim, thereby releasing Farwell and H. C. Potter from contribution, after which Potter sold the bonds to Lyon and Cameron for 60 cents on the dollar, and they afterwards sold them at par, whereby the estate lost, and Lyon and Cameron gained, about $105,000. The bill charges, in substance, that:

1. These notes were allowed only as a contingent claim against the estate, and the executor had no right to pay them.

2. They were collectible from the railroad company, being secured by sufficient collateral.

3. The indorsers Farwell and H. C. Potter were pecuniarily responsible.

4. The bonds received were worth par, and should not have been sacrificed.

These notes were due in 1875, and their face value was $203,500. They were secured by the common consolidated bonds of the company, deposited with Crapo, a trustee, of the par value of $254,375.

These were valid claims against the estate, and were duly allowed in favor of the respective owners. They remained unpaid until November 7, 1877, when a 12 per cent. dividend was paid by the executor, and other dividends were paid, and by the probate court allowed to the executor in his various accounts, which indicates that the court considered these to be absolute allowances against the estate. When the petition for leave to compromise was filed, all of these notes had been due and unpaid for several years, and the holders of the notes had sold them to Lyon and Cameron at rates of discount which indicate that they could not be collected from the railroad company. The notes were secured by the common consolidated bonds of the company, worth, according to the evidence, not over 15 cents in the market. We are satisfied that Farwell and H. C. Potter could not profitably have been prosecuted for contribution. After a partial payment by the executor, the railroad company offered to the holders of its floating debt payment in consolidated bonds, secured by a mortgage upon its land grant, office building, etc. The following is the provision of the trust deed:

" *Whereas*, the said railway company now has undisposed of a considerable number of said consolidated bonds, and there is outstanding and unpaid a floating debt of the company exceeding one million dollars, a portion of which it is desired to fund by the sale of certain of said consolidated bonds for cash, to be used in the payment of said floating debt, or to be sold directly to the owners of said debt to take up and cancel so much thereof, and for the purpose of furnishing additional security for the ultimate payment and redemption of eight hundred of said consolidated bonds, being an aggregate sum of eight hundred thousand dollars; which said consolidated bonds so to be secured are to be designated by the certificate of the trustees, as hereinafter provided."

The resolution under which the offer was made is as follows:

· "*Resolved*, that whenever the holders of the indorsed notes of the company will consent to receive and exchange for their notes the consolidated bonds of the company, with the additional security of land assets provided in the trust deed of August 2, 1875, at the rate of ninety cents, the treasurer be authorized to make such adjustment of interest, the interest of two years being added to notes in settlement, and coupons for two years being detached from the bonds and canceled."

This, then, was the situation: Lyon and Cameron owned the notes, which had been allowed at their full face value against the estate, and they had been partly paid. The only security available to the estate was the $254,000 "common bonds," worth 15 cents, the right to pursue Farwell and Potter as co-indorsers, and the railroad company as maker. Its stock was worth substantially nothing, and the holders of its paper were not attempting to collect from it. At this juncture the executor found an opportunity to secure 90 per cent. in bonds worth 60 cents on the dollar in payment, and, with the approval of the probate court, and the consent of Lyon and Cameron, availed himself of it. If the bonds were worth par, as the bill states, he was justified in making the deal. If they were not worth par, we think him justified in accepting them, and selling them for their value.

We have discussed at length the charges that the executor permitted the estate to suffer, and Lyon and Cameron to profit, from his failure to defend against the contracts of guaranty and suretyship of the testator. It does not appear that any of the proceeds reached Potter, unless it be said that the sale of the North Chicago Rolling-Mill Company interest in the guaranty upon its $230,000 of bonds of the Milwaukee Iron Company for about $50,000 benefited him, which it did to the extent of his proportionate share in the North Chicago Rolling-Mill Company stock. But, as it was a valid claim, the estate was not injured, nor was Potter culpable in sharing as a stockholder.

We have shown how the North Chicago Rolling-Mill Company became possessed of the property of the Wisconsin Iron Company and the Milwaukee Iron Company. It is claimed that it absorbed the estate's interest in the Pneumatic Steel Company also. The Pneumatic Steel Company was formed for the purpose of buying the Bessemer steel patents, and profiting from royalties paid by the various manufacturers of Bessemer steel. We do not discover readily the amount of its capital stock, or the amount that had been paid in, but Ward was owner of $75,000 (par value) of the stock. There is evidence tending to show that it was a profitable venture, and paid large dividends after the death of Ward, and nearly up to the time that it was sold. On April 3, 1877, Potter filed a petition, asking leave to sell this stock at 80 cents. This petition, and, so far as we can learn, the proofs in this case, show that some of the patents had expired, others were about to expire, and that some manufacturers were questioning the validity of other patents, and refused to pay royalties. A company had been formed comprising all of the Bessemer steel companies in this country; and this company had offered to pay 80 cents upon the dollar for the stock of the Pneumatic Steel Company. The North Chicago Rolling-Mill Company was one of the 11 companies which were stockholders in this new concern, and apparently the object was to reduce the cost of manufacture by cutting off the royalties theretofore paid. The Pneumatic Steel Company had no tangible property, and the value of its patents depended entirely on the use that should be made of them. We have no means of knowing whether or not the payment of royalties could have been enforced. We may suspect that this new company was the result of concerted action, to profit at the expense of the Pneumatic Steel Company; but we think it plain that the Ward estate could not profitably have this stock, when all other stockholders accepted the price offered. And, if any complaint can be made of the conduct of the executor, it arises out of the fact that the North Chicago Rolling-

Mill Company was interested in the new company. We cannot see that the amount of dividends paid was very important. Apparently, the estate was where its interests could not be protected, and there is nothing to indicate that the executor could have obtained more for the stock. We can understand how it was possible that he might have been compelled to do worse. Neither Lyon, Cameron, nor Potter acquired this stock, but the concern was bought up by a company in which the North Chicago Rolling-Mill Company was a stockholder. It does not appear that Potter was responsible for, or could have prevented, the North Chicago Rolling-Mill Company's action in this matter, or that it would have made any difference had he done so.

We have now reached a point in the case when we enter upon a discussion of the question whether or not Potter collusively sacrificed the property of the estate. At various stages of the administration of this estate, doubts existed in the minds of many, if not all, conversant with its affairs, of its adequacy to meet its liabilities without drawing from Ludington. This is evidenced in many ways. Ward was hard pressed before he died. There is evidence indicating that the income from his property fell a great many thousand dollars short of his interest account; that he was a borrower on bonds to a large amount, drawing interest at 10 per cent., payable in gold, which was at a premium; and that he was in default upon a contract for $100,000 or more, which he was trying to arrange, when he fell dead, while on his way to a bank in Detroit for that purpose. It appears to have been the opinion of the creditors, as shown by their own appraisal of the property belonging to the estate, and the proceedings of the meetings held by them, and their disposition of their claims at large discounts. Mr. Ashley Pond testified that in March, 1876, "it was *generally thought among the people interested* that an administration of the estate would result in showing its insolvency, and none of the devisees would get anything unless it were Mrs. Ward and

her children." It is shown also by the executor's requiring, and Mrs. Ward's submitting to, the payment of one dollar per M. stumpage upon the land devised to herself and children, upon which agreement she paid upwards of $37,000, and which she never realized, as the property which was applied against it was a part of Ludington; *i. e.*, personal property bequeathed to her in connection with Ludington. Among those who are shown to have shared this belief was the late Gov. Baldwin. Tubal C. Owen is reported to have said that he "had no confidence that there would be a surplus after paying creditors." His letters are full of statements showing the difficulties and dangers under which the estate labored. On May 17, 1876, he wrote Potter:

" We fully appreciate the situation, and the necessity of prompt and heroic action, and yet, in cases of this nature, with the entire bottom of the business of the country gone fishing, or somewhere else, it is possible to go so rapidly that a feeling might arise that we were obliged to realize at once, and the bears could crush us anyway."

And again, to Elijah Smith, he says:

" We are so cramped for money to meet interest, taxes, and insurance that it is impossible to spare a dollar until we can make sales of property, and you must know *that selling property is about an impossible thing.*"

Another letter indicates that, if *forced at that time,* " a sale of the entire property would not bring enough to pay the debts." The widow professed to fear the loss of a part, if not all, of Ludington, and invited into her confidence and counsel her half-brother, John B. Lyon, who was evidently a resourceful man of affairs. It was urged upon the widow that she should make some concessions, and she was sufficiently alarmed to offer to pay into the estate the sum of $300,000 for a release of Ludington by the creditors. A meeting of creditors was had, but the scheme failed, it is said, by reason of the discovery of a liability growing out of Ward's guaranty of the Milwaukee Iron Company bonds, which, until that time, was unknown to

the creditors, and probably to the executor and others interested. This attempted compromise failed, and it became apparent that something to satisfy the importunity of creditors must be done *without delay*. There is testimony that about this time the widow offered to sell her interest for $25,000. It was then proposed by the executor to allow the creditors of the estate to purchase property, applying claims to the extent of 40 per cent. of the purchase price, and some property was conveyed to liquidate debts which it secured. This was with the approval of the probate court.

At or about this juncture, John B. Lyon appears to have become impressed with the idea that his sister's interest might be protected by the purchase of claims against the estate, and he had some talks with her, and possibly an incomplete arrangement to that end, and bought up some claims before the agreement was completed. She hesitated about the matter, and appears to have consulted with Aunt Emily Ward, and various others interested in the estate, and finally acted upon the advice of Senator Thomas W. Palmer, whose counsel she sought. A contract was thereupon drawn between herself and her two brothers, providing for a deed to John B. Lyon of Ludington, to be used as a means of raising money for the purpose of purchasing the claims against the estate. This scheme was successful. Nearly all of the claims were purchased at discounts ranging from 2 to 60 per cent., property of the estate being put up and sold to the Lyons and Mrs. Ward from time to time, and claims to the amount of 40 per cent. of the purchase price applied. This property was turned by the partners, and other purchases made, and the result was that they became purchasers of most of the remaining property of the estate, which, as already stated, under this management, failed to produce enough to pay the debts in full; and, when the executor was discharged, the partners had, and still have, unpaid claims to a large amount, but Ludington remains untouched. It would seem obvious that, if the proceedings

to settle the estate were regular, and there was nothing collusive or fraudulent about the sale and purchase of the assets, these complainants must be content.

Any one except the executor might lawfully buy claims at a discount, and collect their face value, or buy property at executor's sales for what it would bring, and purchase the claims of legatees. It is urged by the counsel for the complainants that these transactions show that large gains were made, and that great benefits were derived, by Potter and his associates, and that some of the property found its way to Potter and his wife. We fail to see that these complainants have a right to complain of the purchase of the claims against the estate. It goes without saying that, if Potter bought claims, it would be for the benefit of the estate; but he does not appear to have bought any.

It is in the sale and purchase of the assets and in the allowance and payment of false claims that the fraud is to be found, if there is any; and one of the most important claims in support of complainants' contention is that assets were sold below the market. The circuit judge has looked at this question in the light of subsequent events. He said, in his opinion, that:

"Now, assuming that there was no general scheme of fraud in this case, it is still contended, as I understand the complainants, that in very many of the transactions which occurred between the defendants Lyon and Mrs. Ward on the one hand, and the defendant Potter on the other, there was particular fraud. As I have already indicated, this partnership bought most of the assets of the estate. It is contended that there was fraud in the purchase of these assets. It appears that, with the exception of some things too trivial to be mentioned, the kind of assets they bought may be divided into 39 classes. On 5 of those the Lyons made money. On 17 of the other 34 they lost money, and on 17 of the other 34 they made less than they lost on that 17. It is to be borne in mind that in making this statement, of course, I decide that the method by which Exhibits 107 to 151 [statements showing net gains and losses on all claims and assets purchased by the partnership] are made up is correct. I think that, for

the purpose of this comparison, defendants are justified in charging interest and expenses, because that is the test of whether they ultimately made or lost by the transaction."

In dealing with this question of fraud, we cannot leave out Mr. Potter, for, if we do, we are met by the proposition that neither the widow nor her brothers were under obligation to refrain from buying either claims or assets upon the best terms possible. We must, therefore, find that these sales, or some of them, involved an attempt by Potter to benefit himself or others, to the exclusion of the interests of the estate. We will not discuss all of the sales, but will examine a few of the transactions which counsel claim to most clearly show collusion and misconduct by Potter. It is not apparent to us that he could have saved anything for the estate from the wreck of the Wisconsin Iron Company or the Milwaukee Iron Company, and we think the proposition that he was the cause of the bankruptcy of the latter, because, as president of the North Chicago Rolling-Mill Company, he permitted what is called a ruinous competition, whereby the Milwaukee Iron Company suffered, has no force. We are satisfied that at the time of Ward's death these enterprises were seriously embarrassed, and they were compelled to succumb to the pressure of the hard times, which had already commenced, and continued for some years thereafter. Most of Ward's investments were in a bad way. The Flint & Pere Marquette stock was worth but little on the market. The Wyandotte Rolling-Mill Company ultimately went into bankruptcy. The New England Mining Company had been sold by Ward, who had received the pay for it, although he did not own all of its stock. This promised litigation, but was settled by the executor in a way which counsel for the complainants approved. The Ward loan bonds, with their 10 per cent. interest, all payable in gold, fell due, and the holders were clamoring for money, and threatening to foreclose upon their mortgages, which covered most of the real estate of Ward; and this, together with some North Chi-

cago Rolling-Mill stock, was ultimately surrendered in settlement of these claims, with the approval of the probate court, and under the advice of eminent counsel.

The North Chicago Rolling-Mill stock, the Pneumatic Steel Company stock, the Flint & Pere Marquette stock, and the claim against the Burlington & Southwestern Railway Company, appear, in the light of subsequent events, to have been the best property that the estate had, and it is upon these that the great profits were made by those who acquired the interest of the estate. To get the benefit, it was necessary to hold them. While it is satisfactorily shown that the valuable lands of the Flint & Pere Marquette Railroad Company ultimately enabled that road to pay every dollar that it owed, and gave its stock a high value in the market, there can be no question that, when sold by Potter, such stock had very little value, and still less demand, and it is also true that its bonds were depreciated. The Burlington & Southwestern Railway Company was in the hands of a receiver, under the manipulation of Smith. It was ultimately sold for a round price, after purchasing the outstanding obligations, by taking bonds upon long time in payment. But it is not shown that these claims had any great market value, and it is probable that the little they had depended on the fact that Elijah Smith, a creditor (and the receiver also), was purchasing them to get control of the road. The Pneumatic Steel Company has been already discussed. It does not appear that Potter could have prevented the formation of the new company, or that he could have realized more for the interest of the estate. The stock in the North Chicago Rolling-Mill Company was sold at prices ranging from 40 to 70 cents, and ultimately was worth much more. Lyon was the purchaser of the various interests. He bought the Flint & Pere Marquette stock for about $3,000, and the Burlington & Southwestern claim at 10 cents on the dollar, and most of the North Chicago Rolling-Mill Company stock at prices named. He and Mrs. Cameron did not hold all of these assets, but sold

them. The Burlington & Southwestern Railway Company claim he sold to Elijah Smith; the North Chicago Rolling-Mill Company stock he sold through Burt, a broker, to various Eastern parties, already stockholders. We do not readily discover what he did with the Flint & Pere Marquette stock, but a profit was doubtless made upon it.

It would not be expedient, if possible, to reiterate all of the facts shown by the record, and the arguments deducible therefrom, that lead us to a conclusion in relation to the question of fraud, but it may be well to allude to some of them. We will refer first to the North Chicago Rolling-Mill Company. This concern paid no dividend after 1871 until 1879. It issued its annual statements regularly, which, we understand, it is customary to make up from trial balance, and usually show the cost, rather than the value, of the property. Net profits, as shown, may not necessarily show an actual profit, for losses and shrinkage may not be deducted. We think we are not mistaken in saying that the business world is slow to charge off probable losses, and may properly take judicial notice of the fact that stringent regulations in that regard are found necessary in our banking system, Federal and State. We will not attempt any examination of the statements of the North Chicago Rolling-Mill Company; but counsel assert, and we do not discover that it is denied, that among its assets was an item of $121,287.51 as the cost of 122 8 per cent. Flint & Pere Marquette bonds, which were not at the time worth over 20 cents on the dollar in the market, though they were probably paid in full ultimately. The test of the value must be the market. It is shown that Potter received as executor 9,725 shares of North Chicago Rolling-Mill stock. Of these, 3,602 shares were sold to others than Lyon and Mrs. Cameron. 3,269 of these were applied in the settlement of the Hathaway and other secured claims, and the mining company claims, at $50, which appear to have been adjusted after April 22, 1878. On February 19th Emily Ward bought 33 shares at $40,

and on April 9th 200 shares at $41. The same day Tubal C. Owen, 2d, bought 100 shares at $41. Lyon and Mrs. Ward purchased the remainder as follows:

| | |
|---|---:|
| April 9, 1878, 600 shares @ | $41 00 |
| April 9, 1878, 800 shares @ | 40 50 |
| April 9, 1878, 300 shares @ | 40 00 |
| June 15, 1878, 2,228 shares @ | 40 00 |
| October 24, 1878, 100 shares @ | 55 00 |
| April 25, 1879, 1,500 shares @ | 74 00 |
| June 6, 1879, 595 shares @ | 100 00 |

Counsel for defendants show that New Bedford, Mass., was the principal market for this stock, where many, if not most, of the large stockholders lived. Kelly, a broker, who made many sales in 1877, 1878, and 1879, testified that $42 was the highest price paid until June, 1878, when the price was $45. On March 9, 1878, five shares sold at public auction in New Bedford for $32 per share. Edward L. Baker, owner of 804 shares, died April 6, 1878, at his home in New Bedford. His appraisers, themselves stockholders for many years, who were familiar with the works and statements, appraised this stock at $35 per share, and Potter (not a relative of the executor), who says he bought and sold this stock a hundred times, testifies that it was, at the time, a fair value. Stock was offered in the spring of 1878, at Warren, R. I., for $35. On June 28, 1878, Burt, the vice-president of the North Chicago Rolling-Mill Company, representing eastern banks who held claims against the estate, refused stock from Lyon at $44 in exchange for these claims, which Lyon had bought. The market in New Bedford from June, 1878, to January, 1879, gradually increased from $45 to $75. Burt paid $50, on September 17, 1878, for the stock of the Wyandotte Rolling-Mill Company, held by the assignee in bankruptcy. No attempt was made to show that a higher market value prevailed, but it is claimed that Potter and Burt and others were in collusion, and concealed the prosperity of the company, and misrepresented the actual value of the stock, for the purpose of enabling others to acquire the stock belonging to the estate cheaply.

We are of the opinion that this record does not show that Potter entered into a conspiracy to defraud this estate. We are not convinced that he shared in the amount received by Lyon for the Milwaukee Iron Company bonds, or the margin of 30 cents on the Flint & Pere Marquette Company bonds, or that he ultimately became the owner of the North Chicago Rolling-Mill Company stock which the estate sold. It is probable that Elijah Smith realized a large profit from his manipulation of the Burlington & Southwestern Railway stock, but there is nothing beyond that fact, and the purchase of the Ward interest at a low price, that indicates complicity, or that Potter shared in these profits. We are justified in saying that Ward left an indebtedness of one and a half millions. His property was not of a character which permits the application of the term "quick assets" to any considerable portion of it. His Wisconsin and Milwaukee Iron Company stock was not worth a dollar. His Flint & Pere Marquette stock is not shown to have had a market value at the time, and his claim against that road could not have been sold for any considerable price. His estate was loaded with lands, which, in the then existing condition of the market, could not be sold for any but ruinous prices, if at all, and they were covered by mortgages securing a large issue of 10 per cent. bonds, payable in gold (which was at a premium), and the holders were endeavoring to realize through legal proceedings. We agree with the circuit judge that it was wise to take bonds of the Flint & Pere Marquette Railroad Company at 90 cents in the settlement of that claim, and are of the opinion that the executor was justified in selling them, instead of waiting until the trustees should try to enforce payment from the railroad property, or attempting to enforce contribution against Farwell or H. C. Potter.

In the light of what followed, we can see that, had it been possible for the estate to put off the payment of debts, and hold its property, and had the creditors, not only of Ward, but of the various concerns in which he was inter-

ested, been content not to press their suits, much more might have been realized from the property. But what is now past, with its certainties, was then future, with its uncertainties. The executor was under no obligation, if he had the ability, to advance money to carry an estate which was practically without income, to meet taxes, insurance, and large installments of interest, to say nothing of principal, upon past-due obligations; nor did the law require it. Possibly Potter might have handled the Burlington & Southwestern Railway matter as Smith did, if he had the opportunity, but the law would not require it, nor sanction it if he failed; and certainly the estate could not furnish the means to do it. If he did not, there was but one thing for him to do, viz., to get the most possible out of the investment. We cannot say that he did not. Whether Smith, as receiver of a federal court, was guilty of infractions of the law, is not a question for us to examine, and mulct Potter, if we shall determine that a receiver should not speculate out of the trust fund. That court, and the parties before it, do not appear to have been dissatisfied. If Potter was not in collusion with him, or neglectful of duty, in that he did not realize more from the Burlington & Southwestern Railway Company bonds, complainants can have no relief in the premises. He was not bound to know Smith's designs, or take the chances of his success, if he did know them.

Innumerable objections are raised to the validity of the acts of the executor, and it is sought to hold him responsible and liable for alleged illegal acts in the management of this estate. As specimens of this, we may mention some; *e. g.:* It is said that he had no authority to sell personal property at auction; that the probate court had not authority to order sales of property upon the terms provided; that it was not lawful, with or without the sanction of the probate court, to barter property in payment of debts; and it may be doubtful if there is a single instance of the sale of property by the executor that is not condemned by one or more of the briefs filed in this case, al-

though there is one instance which one of the briefs sanctions, because it resulted advantageously. This is a suit in equity. It is not an effort to reach the property of the estate, which was sold 20 years ago, upon equitable principles, but an effort to hold the executor responsible. If it shall appear that it was the executor's duty to sell, and he received all that could be reasonably expected at the time, these parties, who were cognizant of what was being done, and did not interpose, cannot expect a court of equity to give them relief, without requiring them to do equity. There is no ironclad rule of law that compels us to ignore the fact that the estate has had the substantial value of its property applied to its obligations at a time when the law required it, and to render a decree requiring the executor to pay the value of such property to the heirs or devisees because the administration proceedings have not been technically legal, though they have at each and every step received the approval of the probate judge. We are satisfied that by "bartering," as it is called, property which could not have been otherwise sold was made to go further in payment of debts than it would otherwise have done. We therefore pass many of the questions that are discussed.

It is possible, and perhaps probable, that Lyon had an understanding with Smith, before he bought the Burlington claim. Perhaps he was engaged with him in the manipulation of that matter. Again, he may have invoked the aid of Burt in the matter of the North Chicago Rolling-Mill stock. But this he had a right to do. He was speculating in matters of large magnitude, subject to the vicissitudes of a fluctuating market and troublesome times. He had the judgment to foresee a probable improvement in values, the nerve to take risks, and the zeal and address to bring about results. It is said he reaped large profits, and probably he did. It is contended that Potter knew the condition of the North Chicago Rolling-Mill Company, and should have let it be known to the world; that, instead, he talked discouragingly, and that

he thereby aided his friends to purchase at a low price, receiving, as compensation, increased salary, and large private concessions in connection with the business. It is pointed out that he has become suddenly rich, and that the method is not explained; that he owns a palatial residence, and a costly cottage at some resort,—matters that do not throw much light on these questions; and much stress is laid upon an alleged refusal to produce in evidence certain books and correspondence. We do not find the proof of alleged undervaluation sufficiently cogent to lead us to attach much importance to it. From what we know of the nature and methods of such business enterprises as the North Chicago Rolling-Mill Company, actual values as well as market values are uncertain and fluctuating. Indeed, it may be doubtful if, as a rule, the latter is not the most accurate and safest test. Naturally, the market for such stock would be found among its stockholders and their most intimate friends, as was the case here; and presumably they were advised as to the value of the stock, and there were enough of them to make a reasonable competition probable. As to the alleged refusal to produce testimony, there is nothing to show a destruction of it, or that the complainants could not have obtained access to it if proper methods had been pursued. We do not feel justified in deciding this case upon a bare refusal to produce documents, the contents of which are the subject of mere conjecture. It is true that the circumstances of this estate afforded an opportunity for speculation on the part of the executor, but we are unable to say that we think the claim that he availed himself of it is sustained.

The decree of the circuit court in chancery is affirmed, with costs.

The other Justices concurred.